FILED
2014 Aug-08  PM 04:33
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **JANET L. SKOTNICKI,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  2:11-CV-03497-RDP** |
| | } | |
| **BOARD OF TRUSTEES OF THE** | } | |
| **UNIVERSITY OF ALABAMA, et al.,** | } | |
| | } | |
| **Defendants.** | } | |

## MEMORANDUM OPINION

This case is before the court on Defendants' Motion for Summary Judgment (Doc. #56), filed on August 30, 2013.  The Motion (Doc. #56) has been fully briefed. (Docs. #57, #62, #63). For the reasons outlined below, the Motion (Doc. #56) is due to be granted.

## I.     Procedural History

Plaintiff Janet L. Skotnicki ("Plaintiff" or "Skotnicki") initiated this lawsuit on September 28, 2011 by filing a Complaint (Doc. #1) against Defendants Board of Trustees of The University of Alabama ("Board of Trustees"), Robert Bourge ("Bourge"), Susan Conrad ("Conrad"), Alesia Jones, and Gary Jones (collectively, "Defendants").  Plaintiff subsequently filed an Amended Complaint (Doc. #10) and a Second Amended Complaint (Doc. #18), after which Defendants responded with their respective Answers (Docs. #19, #28, #48).  On August 30, 2013, Defendants filed a Motion for Summary Judgment (Doc. #56), along with a Supporting Brief (Doc. #57).  Plaintiff filed her Response (Doc. #62) on September 20, 2013, and Defendants filed their Reply (Doc. #63) on October 1, 2013, rendering Defendants' Motion (Doc. #56) properly under submission.

## II.      Facts[1]

Plaintiff, a forty-one-year-old female, is a registered nurse who began working at UAB in January 1994. (Doc. #58, Ex. A-3 at 1; Doc. #58, Ex. A-1, Pl. Dep. at 12).  From January 1994 to March 1996, Plaintiff worked in the kidney and liver transplant department at UAB, after which she worked for a year and a half in the open heart unit at Birmingham's Veterans' Administration Hospital. (Doc. #58, Ex. A-1, Pl. Dep. at 12).   In November 1998, Plaintiff returned to work at UAB, this time serving in the coronary care unit. (*Id.* at 13).   Around that time, Plaintiff was diagnosed with a neurological condition known as cerebellar ataxia.[2] (*Id.* at 37-38).  Despite her disorder, Plaintiff was able to work in a patient care capacity in the coronary care unit until September 2007. (Doc. #58, Ex. A-1, Pl. Dep. at 13, 38; Doc. #58, Ex. A-3 at 2). As of September 2007, she was no longer able to perform the essential functions of her position. (Doc. #58, Ex. A-3 at 2).

From September to October 2007, Plaintiff took a medical leave of absence, in order to seek treatment for her neurological condition. (Doc. #58, Ex. A-3 at 2).   During this period, Plaintiff received a call from her supervisor, Pat Long, who informed her that a new position (admit nurse) had been created in the coronary care unit, one that Plaintiff could assume after finishing her treatment. (Doc. #58, Ex. A-1, Pl. Dep. at 44-45).  However, upon her return from medical leave, Plaintiff instead accepted an offer to work in the interventional cardiology office, which was experiencing a nursing shortage and needed temporary office assistance. (Doc. #58,

---

[1] The facts set out in this opinion are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record.  All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002).  These are the "facts" for summary judgment purposes only.  They may not be the actual facts that could be established through live testimony at trial. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

[2] Plaintiff testified that her neurological condition was diagnosed in 1998, but did not provide any greater specificity. (Doc. #58, Ex. A-1, Pl. Dep. at 38—"[W]hen I got diagnosed was probably '98 . . .").

Ex. A-1, Pl. Dep. at 13, 45).   At full capacity, the interventional cardiology office typically employed four nurse practitioners; however, by the end of 2007, the office only had three nurse practitioners, leaving a void that was filled by Plaintiff and Angela Jackson--a registered nurse from the coronary care unit who was likewise returning from medical leave due to a shoulder injury--both of whom performed office-based nursing duties. (Doc. #58, Ex. A-3 at 2).

Plaintiff's condition gradually deteriorated over the course of her time in the interventional cardiology office, and that affected her ability to consistently maintain her balance. (Doc. #58, Ex. A-3 at 2).   In an attempt to address her balance issue, Defendant accommodated Plaintiff by allowing her to use a balance assistance service dog, Heidi.   (Doc. #58, Ex. A-1, Pl. Dep. at 61).   However, Heidi was not well-suited to Plaintiff's office environment, so instead Plaintiff used a walker until she was able to obtain a more suitable service dog, Splash. (*Id*. at 62).

Plaintiff began working in the interventional cardiology office with the express understanding that her appointment there was temporary in nature. (Doc. #58, Ex. A-1, Pl. Dep. at 52).   However, in early February 2009, Plaintiff was told by David Lawson—a nurse practitioner in the interventional cardiology office—that her position could be made permanent, noting that he had addressed the subject with Dr. Robert Bourge, Director of the Division of Cardiovascular Disease, and Susan Conrad, the Administrative Director of Cardiovascular Services at UAB. (Doc. #58, Ex. A-1, Pl. Dep. at 53; Doc. #58, Ex. A-3 at 34)   Unfortunately, this turned out to be false information and, by late February 2009, Plaintiff was aware that her job would end when a full complement of nurse practitioners (*i.e.*, four nurse practitioners) was obtained. (Doc. #58, Ex. A-1, Pl. Dep. at 57-58).

3

A fourth nurse practitioner was, in fact, hired in November 2009, and Plaintiff was informed shortly thereafter that her position in interventional cardiology would end on April 2, 2010. (Doc. #58, Ex. A-1, Pl. Dep. at 84).  Despite this knowledge, Plaintiff maintained a vague notion that she would continue to be employed by UAB, with the possibility that she would return to work in the coronary care unit. (*See, e.g.*, Doc. #58, Ex. A-1, Pl. Dep. at 83, 92). Angela Jackson's position in the interventional cardiology office was also terminated, but she eventually returned to patient care in the coronary care unit. (Doc. #58, Ex. A-1, Pl. Dep. at 71-72).

 In February 2010, Plaintiff applied for FMLA leave, seeking to begin a period of medical leave when her position in interventional cardiology ended. (Doc. #58, Ex. A-1, Pl. Dep. at 80-81).  By letter dated February 17, 2010, UAB's human resources office approved Plaintiff's FMLA leave request, with her leave set to begin on April 4, 2010. (Doc. #58, Ex. A-3 at 54).  However, on February 18, 2010, Plaintiff received a memorandum from Susan Conrad, which informed her that she would no longer be employed by UAB as of March 26, 2010.  (Doc. #58, Ex. A-1, Pl. Dep. at 91; Doc. #58, Ex. A-3 at 41).  The memorandum also addressed her FMLA leave request, concluding that such leave would be unavailable in light of the termination of her employment. (Doc. #58, Ex. A-3 at 41—"Because your employment will have ended by [the proposed FMLA-leave starting] date, we are unable to grant you FMLA unless you secure other employment with UAB prior to that time.").

This updated leave decision was confirmed by Alesia Jones, Chief Human Resources Officer at UAB, in a letter dated March 22, 2010. (Doc. #58, Ex. A-3 at 5—"[Y]ou will be ineligible for a leave of absence because you will not be able to return to either of your previous positions.").  In the same letter, though, Ms. Jones offered Plaintiff a glimmer of hope, reassuring

her that "our HR offices are committed to helping you in your search for other employment opportunities within the University." (Doc. #58, Ex. A-3 at 5).   Both before and after her termination, Plaintiff applied for a number of part-time, benefitted jobs at UAB, but was unable to secure further employment. (Doc. #58, Ex. A-3 at 35-39, 42).   As a result, Plaintiff was terminated and forced to activate her disability retirement benefits. (Doc. #58, Ex. A-3 at 3).

## III.    Standard of Review

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).   The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.   *Celotex*, 477 U.S. at 323.   Once the moving party has met its burden, Rule 56(c) requires the non-moving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *See id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).   All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).   A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.   If

the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

If the moving party bears the burden of proof at trial, it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact (*i.e.*, facts that would entitle it to a directed verdict if not controverted at trial). *Fitzpatrick*, 2 F.3d at 1115.  Once the moving party makes such a showing, the burden shifts to the nonmoving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the nonmoving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this method, the nonmoving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the nonmoving party on the issue in question. This method requires more than a simple statement that the nonmoving party cannot meet its burden at trial, but does not require evidence negating the nonmovant's claim; it simply requires the movant to show that there is an absence of evidence to support the nonmoving party's case. *Fitzpatrick*, 2 F.3d at 1115-16.

If the movant meets its initial burden by using this second method, the nonmoving party may either rely on evidence in the record, overlooked or ignored by the movant, sufficient to

withstand a directed verdict, or the nonmoving party may come forward with additional evidence that is sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the nonmovant can no longer rest on mere allegations, but must set forth evidence of specific facts. *Lewis v. Casey*, 518 U.S. 343, 358 (1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

## IV.    Discussion

After careful review of the Rule 56 record and the parties' briefs, and for the reasons stated below, the court concludes that Defendants' motion should be granted in full.

### A.    Overview of Defendants' Arguments in Support of Summary Judgment

Plaintiff's Second Amended Complaint (Doc. #18) includes sixteen causes of action: (1) disparate treatment in violation of Title I of the Americans with Disabilities Act (ADA), pled against Defendants Robert Bourge, Susan Conrad, and Alesia Jones in their official capacities (Count I); (2) failure to accommodate in violation of ADA Title I, pled against Defendants Bourge, Conrad, and Alesia Jones in their official capacities (Count II); (3) retaliation based on ADA Title I in violation of ADA Title V, pled against Defendants Bourge, Conrad, and Alesia Jones in their official capacities (Count III); disparate treatment in violation of ADA Title II, pled against Defendants Bourge, Conrad, and Alesia Jones in their official capacities (Count IV); (5) failure to accommodate in violation of ADA Title II, pled against Defendants Bourge, Conrad, and Alesia Jones in their official capacities (Count V); (6) retaliation based on ADA Title II in violation of ADA Title V, pled against Defendants Bourge, Conrad, and Alesia Jones in their official capacities (Count VI); (7) interference in violation of the Family and Medical Leave Act (FMLA), pled against Defendants Conrad, Gary Jones, and Alesia Jones in their official capacities (Count VII); (8) retaliation in violation of the FMLA, pled against Defendants

Conrad and Alesia Jones in  their official capacities (Count VIII); (9) disparate treatment in violation of ADA Title II, pled against Defendant Board of Trustees (Count IX); (10) failure to accommodate in violation of ADA Title II, plead against Defendant Board of Trustees (Count X); (11) retaliation based on ADA Title II in violation of ADA Title V, pled against Defendant Board of Trustees (Count XI); (12) disparate treatment in violation of § 504 of the Rehabilitation Act of 1973 (Rehabilitation Act), pled against Defendant Board of Trustees (Count XII); (13) failure to accommodate in violation of § 504 of the Rehabilitation Act, pled against Defendant Board of Trustees (Count XIII); (14) retaliation in violation of § 504 of the Rehabilitation Act, pled against Defendant Board of Trustees (Count XIV); (15) retaliation based on ADA Title II in violation of ADA Title V, pled against Defendants Bourge, Conrad, and Alesia Jones in their individual capacities (Count XV); and (16) violation of the Alabama Disability Discrimination Statute, pled against Defendants Bourge, Conrad, and Alesia Jones in their individual capacities (Count XVI).

Defendants' Motion (Doc. #56) seeks judgment as to all of Plaintiff's claims pursuant to Federal Rule of Civil Procedure 56.  Indeed, in their Brief in Support of its Motion for Summary Judgment (Doc. #57), Defendants argue that (1) Plaintiff's ADA claims against Defendant Board of Trustees are due to be dismissed as a result of the Board's Eleventh Amendment immunity, (2) Plaintiff's ADA and Rehabilitation Act claims against Defendants Bourge, Conrad, Alesia Jones, and Gary Jones are due to be dismissed, because neither of those statutes provide for causes of actions against individuals, (3) Plaintiff's disability discrimination claims under the ADA and Rehabilitation Act are due to be dismissed, because she is incapable of establishing a *prima facie* case of discrimination, (4) even if Plaintiff were capable of demonstrating a *prima facie* case of discrimination, her ADA and Rehabilitation Act claims are still be due to be

dismissed because she is unable to show that Defendants' reasons for terminating her were pretextual, (5) Plaintiff's retaliation claims under the ADA and Rehabilitation Act are due to be dismissed because she is unable to demonstrate a sufficient causal relationship between her protected activity and Defendants' adverse employment action, (6) Plaintiff's FMLA claims are due to be dismissed, as she was not an eligible employee under the FMLA when her requested leave was set to begin, and (7) Plaintiff's claim under the Alabama Disability Discrimination Statute is due to be dismissed because the statute does not provide for a private right of action and, in any event, Defendants would be shielded from any liability by the State of Alabama's sovereign immunity.  Defendants' arguments and Plaintiff's responses are addressed below.

**B.     No Factual Basis Exists for Plaintiff's Claims Against Defendant Board of Trustees Under Title II of the ADA**

Plaintiff attempts to advance three ADA claims against Defendant Board of Trustees: (1) disparate treatment in violation of Title II (Count IX), (2) failure to accommodate in violation of Title II (Count X), and (3) retaliation based on Title II in violation of Title V (Count XI). (Doc. #18 at 40-45).  Although Plaintiff purports to invoke Title II of the ADA, she fails to present any factual basis for doing so.  "Title II, §§ 12131-12134, prohibits any public entity from discriminating against 'qualified' persons with disabilities *in the provision or operation of public services, programs, or activities*." *Tennessee v. Lane*, 541 U.S. 509, 517 (2004) (emphasis added).  There is simply nothing in the Rule 56 record that touches on disability discrimination as it relates to the provision or operation of public services, programs, or activities.  Rather, Plaintiff's claims address disability discrimination in the *employment* context, which is covered by Title I of the ADA. 42 U.S.C. §§ 12111-12117.  Because Plaintiff has failed to make any showing as to disability discrimination in the provision or operation of public services, programs,

or activities, her Title II ADA claims against Defendant Board of Trustees (Counts IX-XI) are due to be dismissed.

### C.   The Eleventh Amendment Bars Plaintiff From Pursuing ADA Title I Claims Against Defendant Board of Trustees

Although Title II bears no connection to Plaintiff's allegations of employment discrimination, it seems unlikely that Plaintiff's invocation of Title II was the result of a misunderstanding of the ADA.  Rather, it appears that Plaintiff's use of Title II is an attempt to end run around the Eleventh Amendment's bar on private suits seeking money damages for state violations of Title I, the provision that most accurately encompasses the substance of Plaintiff's claims. *See Board of Trustees of University of Alabama v. Garrett*, 531 U.S. 356, 360 (2001).  In actuality, Plaintiff's ploy is ineffectual, and serves to highlight that Defendant Board of Trustees cannot be reached under Title I of the ADA and that any claims rooted in that provision (*i.e.*, Counts IX-XI) are due to be dismissed.

### D.   Plaintiff May Not Sue Defendants Robert Bourge, Susan Conrad, Alesia Jones, and Gary Jones Under the ADA

Plaintiff also advances numerous claims against Defendants Bourge, Conrad, Alesia Jones, and Gary Jones, both in their official (Counts I-VI) and individual (Count XV) capacities under the ADA.  These claims are due to be dismissed, as "the Disabilities Act does not provide for individual liability, only for employer liability." *Mason v. Stallings*, 82 F.3d 1007, 1009 (11th Cir. 1996).  Indeed, the ADA is analogous to Title VII and the ADEA in this area, only providing for relief "against the employer, not individual employees whose actions would constitute a violation of the Act[s]." *Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir. 1991); *see also Smith v. Lomax*, 45 F.3d 402, 403 n.4 (11th Cir. 1995) (Individuals "cannot be held liable under the ADEA or Title VII.").  Furthermore, Plaintiff's official capacity claims against these

individual defendants are indistinguishable from her ADA claims against the Board of Trustees, rendering them redundant and duplicative. *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.").  Accordingly, Plaintiff's ADA claims against Defendants Bourge, Conrad, Alesia Jones, and Gary Jones (Counts I-VI & XV) are due to be dismissed.

    **E.**    **Defendants Are Entitled to Summary Judgment on the Merits of Plaintiff's FMLA Claims**

"The FMLA provides that an 'eligible employee' is entitled to a maximum of twelve weeks of leave during which her employment status is protected.  The FMLA recognizes two types of claims for alleged violations of these provisions: interference claims, in which employers burden or outright deny substantive statutory rights to which their employees are entitled, and retaliation claims, in which employers discharge employees for exercising their FMLA right to leave." *O'Connor v. PCA Family Health Plan, Inc.*, 200 F.3d 1349, 1352 (11th Cir. 2000) (internal citations omitted).  Plaintiff pursues both types of FMLA claims in the present case (Counts VII & VIII), but does so unsuccessfully.  Indeed, Defendants are entitled to summary judgment on Plaintiff's FMLA claims for the reasons stated below.

    **1.**    **Plaintiff's Interference Claim**

In order to state a claim for interference, "a plaintiff need only demonstrate that [she] was entitled to but denied [a substantive FMLA] right.  [She] does not have to allege that [her] employer intended to deny the right; the employer's motives are irrelevant." *Strickland v. Water Works and Sewer Board of the City of Birmingham*, 239 F.3d 1199, 1208 (11th Cir. 2001).  Here, Plaintiff advances an FMLA interference claim against Defendants Conrad, Gary Jones, and Alesia Jones, asserting that "Defendants interfered with the exercise of rights to which she was

entitled under the FMLA," namely the right to go on leave. (Doc. #18 at 36-38).  Plaintiff attributes numerous instances of interference to Defendants,[3] but, ultimately, such allegations are of no consequence, as Plaintiff cannot demonstrate that she was *entitled* to her requested leave. Indeed, Plaintiff's requested leave fell outside her term of employment (*i.e.*, during a period when she would otherwise be ineligible to invoke the protections of the FMLA), a set of circumstance of which she was fully cognizant at the time of her request.

Despite her later protestations to the contrary,[4] Plaintiff knew as early as February 2009 that—barring her ability to secure another job—her employment with UAB would be terminated after the expiration of her position in the interventional cardiology office.  In an email dated February 26, 2009, Plaintiff laid out this harsh reality for Dr. Vijay Misra:

> Although I was told last week that it appeared my job in the Interventional Cardiology office might become permanent, I learned this week that such will not be the case and that my job will end when a fourth N.P. is hired.  Hopefully, that will change and I will be made a permanent employee, but as much as I would like for that to happen, I don't think can't [sic] count on it.  Although I am still technically a CCU employee, unlike Angela, I am unable to return to work in CCU because of my neurological illness.  *Unless I have another office-type nursing job lined up in advance, I would have to file for disability status when my job here ends.*

---

[3] The most concise distillation of Plaintiff's interference allegations is found in her Second Amended Complaint (Doc. #1), wherein she asserts:

> 106.   Defendant G. Jones, after initially informing Plaintiff that he had "no problem" with Plaintiff applying for FMLA leave, changed his mind and later informed Plaintiff that he would have to "consult H.R." before he could provide Plaintiff with the FMLA forms.

> 107.   Defendant Conrad was the author of the February 11, 2010 termination letter that also informed Plaintiff that her FMLA leave was denied.

> 108.   Defendant A. Jones is also responsible for the decision to deny Plaintiff's FMLA leave because she was UAB's Chief Human Resources Officer.

Doc. #18 at 37. *See also* Doc. #58, Ex. A-1, Pl. Dep. at 25-35.

[4] Doc. #58, Ex. A-3 at 40—"My current position is ending, but not necessarily my employment with UAB so I believe my leave request is due to be granted."

Doc. #58, Ex. A-3 at 20 (emphasis added).  Plaintiff reiterated her understanding on February 10, 2010, as she prepared to file her leave request: "I have decided to apply for a medical leave of absence to begin immediately when my job in the Interventional Cardiology office ends on April 2.  I plan on receiving medical treatment for my medical condition during that time and *hope to be able to find another position at UAB before the leave ends so that I can return to work*." (Doc. #58, Ex. A-3 at 40) (emphasis added). Clearly, she did not maintain any sort of illusion that, absent a permanent post, her employment with UAB would survive the conclusion of her interventional cardiology job.  Rather, the record evidence demonstrates that Plaintiff viewed her requested leave as a stop gap measure, buying her time to find a new position.

Unfortunately, the FMLA was not designed to serve such a purpose.  Instead, it is intended to protect the ability of eligible employees (*i.e.*, those currently employed) to take leave. *O'Connor*, 200 F.3d at 1353.  Because Plaintiff was not entitled to the requested leave in the first place, her FMLA claim for interference fails and is due to be dismissed.

### 2.       Plaintiff's Retaliation Claim

In order to successfully pursue a retaliation claim, "an employee must demonstrate that [her] employer intentionally discriminated against [her] in the form of an adverse employment action for having exercised an FMLA right." *Strickland*, 239 F.3d at 1207.  This represents a heavier burden than that borne by an FMLA Plaintiff in demonstrating an interference claim. Here, Plaintiff's retaliation claim rests on the theory that Defendants fired her for requesting leave,[5] but the undisputed evidence in the Rule 56 record simply does not support an assertion

---

[5] Plaintiff's Deposition:

> Q:   Okay.  So your only claim for retaliation under the Family and Medical
>       Leave Act is based on your asking for medical leave; is that right?
>
> A:   Yes.

that Defendants intentionally discriminated against Plaintiff because she engaged in protected FMLA activity.

Absent direct evidence of an employer's discriminatory intent (which does not exist in the present case), a claim of retaliation under the FMLA may be evaluated using a contextualized *McDonnell-Douglas* burden-shifting framework.   Under this framework, Plaintiff is initially burdened with establishing a *prima facie* case of retaliation, which requires a showing that (1) she engaged in protected activity; (2) she suffered an adverse employment decision; and (3) the decision was causally related to the protected activity. *Strickland*, 239 F.3d at 1207, citing *Parris v. Miami Herald Publ'g Co*., 216 F.3d 1298, 1301 (11th Cir. 2000).  Here, Plaintiff's *prima facie* showing is undone by the third element (causation).

As outlined more fully above, it was definitively known in early February 2009 that Plaintiff's job in the interventional cardiology office would end as soon as a full roster of nurse practitioners was assembled. (Doc. #58, Ex. A-3 at 20).   After a fourth nurse practitioner was hired, Plaintiff was, in fact, given an exact date of departure. (Doc. #58, Ex. A-1, Pl. Dep. at 84). *Thereafter*, Plaintiff submitted her request for leave, having already being informed that her job in interventional cardiology was ending.  (Doc. #58, Ex. A-3 at 40).  In other words, any alleged adverse employment decision had been announced *before* Plaintiff engaged in any protected activity.   Accordingly, Plaintiff cannot assert in good faith that Defendants sought to intentionally discriminate against her as a result of her protected activity, and her FMLA retaliation claim (Count VIII) is due to be dismissed.

---

Doc. #58, Ex. A-1, Pl. Dep. at 27.

**F.      Defendants Are Entitled to Summary Judgment on the Merits of Plaintiff's Claims under the Rehabilitation Act**

Plaintiff asserts three Rehabilitation Act claims against Defendant Board of Trustees: (1) disparate treatment in violation of Section 504 of the Rehabilitation Act (Count XII), (2) failure to accommodate in violation of Section 504 of the Rehabilitation Act (Count XIII), and (3) retaliation in violation of Section 504 of the Rehabilitation Act (Count XIV). (Doc. #18 at 45-50).

The Rehabilitation Act generally prohibits any program or activity receiving federal funds from discriminating against otherwise qualified individuals with a disability. *Mullins v. Crowell*, 228 F.Ed 1305, 1313 (11th Cir. 2000); *see also* 29 U.S.C. § 794(d).   Because the Rehabilitation Act shares a liability standard with the ADA, claims under the Rehabilitation Act are evaluated in the same manner as those under the ADA, including use of the *McDonnell-Douglas* burden-shifting framework for claims that rely only on circumstantial evidence. *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005); *Collado v. United States Postal Service Co.*, 419 F.3d 1143, 1149-50 (11th Cir. 2005).   When analyzed under the *McDonnell-Douglas* standard, Plaintiff's Rehabilitation Act claims fail to pass muster.

**1.      Plaintiff's Disparate Treatment Claim**

"To establish a prima facie case of discrimination under the Act, an individual must show that (1) [s]he has a disability; (2) [s]he is otherwise qualified for the position; and (3) [s]he was subjected to unlawful discrimination as the result of his disability." *Sutton v. Lader*, 185 F.3d 1203, 1207 (11th Cir. 1999).   To this end, Plaintiff alleges that—because of her disability—"the entity Defendant (i) failed to make permanent Plaintiff's position as admit nurse in the I.C. Office and instead terminated her, and (ii) refused to hire Plaintiff in other positions for which she applied at UAB and was qualified." (Doc. #18 at 46).

If Plaintiff satisfies all of the elements of a *prima facie* case of discrimination--and, in this case, the court assumes for purposes of summary judgment evaluation that she does--the burden then shifts to the Defendant, who is required to "articulate a legitimate, nondiscriminatory reason for [their] employment actions[s]." *Raytheon Co. v. Hernandez*, 540 U.S. 44, 49 n.3 (2003). Defendant Board of Trustees undoubtedly meets this burden of articulation, supplying legitimate, non-discriminatory explanations for the two adverse employment actions that Plaintiff attempts to infuse with an indicia of discrimination (*i.e.*, the failure to make her position in interventional cardiology permanent and failure to hire her into other positions for which she applied).[6]

It is at this point in the *McDonnell-Douglas* burden-shifting framework--when Plaintiff must demonstrate that Defendant's articulated reasons were simply pretext for illegal discrimination--that Plaintiff's discrimination claim fails. "[T]o avoid summary judgment [the plaintiff] must introduce significantly probative evidence showing that the asserted reason is merely pretext for discrimination." *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1228 (11th Cir. 1993) (citations omitted) (addressing the *McDonnell-Douglas* scheme in the context of a Title VII claim). A reason is not pretext for discrimination "unless it is shown both that the reason was false, and that discrimination was the real reason." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 515 (1993) (Title VII).

Here, the Rule 56 record lacks any indication that the explanations set forth by Defendant are pretextual. In fact, rather than "meet[ing] [the proffered] reason[s] head on and rebut[ting] [them]," *Chapman v. AI Transp.*, 299 F.3d 1012, 1030 (11th Cir. 2000) (en banc) (addressing an

---

[6] Defendants assert that Plaintiff's temporary assignment in the interventional cardiology office was terminated because a full complement of nurse practitioners had been hired, not because of her disability. (Doc. #57 at 12-13). Likewise, they represent that Plaintiff's failure to obtain other employment at UAB had nothing to do with her disability, but instead generally resulted from the fact that she was less qualified than other applicants. (*Id.* at 14).

ADEA claim), Plaintiff's deposition testimony lends credence to the non-discriminatory reasons articulated by Defendant.  For example, Plaintiff testified that she knew from the beginning of her time in interventional cardiology that her assignment was temporary, and, as early as May 2008, was aware that her position would end when a fourth (and final) nurse practitioner was hired. (Doc. #58, Ex. A-1, Pl. Dep. at 52, 55).  Plaintiff's testimony supports Defendant's non-discriminatory explanation, demonstrating the consistency and legitimacy of their articulated basis for ending her assignment.  Likewise, Plaintiff's testimony concerning her failed job search at UAB does nothing to refute Defendant's reason for not hiring her (*i.e.*, she was not qualified for the positions to which she applied and, in any event, other applicants were more qualified for such positions). (*See, e.g.*, Doc. #58, Ex. A-1, Pl. Dep. at 73-80).

Because Plaintiff has offered *no* evidence to challenge Defendant's articulated reasoning, she has failed to meet her burden on summary judgment of demonstrating pretext in Defendant's adverse employment decisions.  Accordingly, Defendant Board of Trustees is entitled to summary judgment on Plaintiff's disparate treatment claim under § 504 of the Rehabilitation Act.

### 2.    Plaintiff's Failure to Accommodate Claim

In order to meet her initial, *prima facie* burden in regard to her Rehabilitation Act claim asserting a failure to accommodate, Plaintiff must show that: (1) she is disabled; (2) she is a qualified individual; and (3) she was discriminated against by way of defendant's failure to provide a reasonable accommodation. *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001).  "The plaintiff bears the burden of identifying an accommodation, and of demonstrating that the accommodation allows him to perform the job's essential functions." *Id.* at 1255-56.  An employee is not entitled to any and all accommodations, but only those that are

reasonable. *Earl Mervyns, Inc.*, 207 F.3d 1361, 1367 (11th Cir. 2000).  Some examples of reasonable accommodations are: "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modifications of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9)(B).  Although employers are legally obligated to provide eligible employees with reasonable accommodations, they do not have an affirmative duty to seek out accommodations, as "the ADA provides no cause of action for failure to investigate possible accommodations." *Willis v. Conopco, Inc.*, 108 F.3d 282, 285 (11th Cir. 1997) (quotations omitted).

Here, Plaintiff asserts that "Defendant failed to accommodate Plaintiff's disability by [1] failing to make permanent Plaintiff's position as admit nurse in the I.C. Office and instead terminated [sic] her, and [2] refusing to hire Plaintiff in other positions for which she applied at UAB and was qualified." (Doc. #18 at 48).  Even assuming for purposes of summary judgment evaluation that Plaintiff is disabled and otherwise qualified, she cannot meet her initial burden because her requested accommodations were not reasonable.

The initial accommodation sought by Plaintiff—transforming her temporary assignment in the interventional cardiology office into a permanent position—was not reasonable.  As has been highlighted *ad nauseam* above, Plaintiff's temporary position in interventional cardiology (which was itself an accommodation for Plaintiff, who was unable to continue in her previous patient care role in the coronary care unit because of her neurological condition) was just that—a temporary job from the very beginning.  It became available because the office was at that time experiencing a shortage of nurse practitioners. (Doc. #58, Ex. A-1, Pl. Dep. at 45).  Further, it is

undisputed that throughout her tenure, Plaintiff was aware that her position would end when a full complement of nurse practitioners was hired (Doc. #58, Ex. A-1, Pl. Dep. at 55-58), as the office had advanced nursing needs (including direct patient care),[7] only some of which Plaintiff was capable of fulfilling.  So, in attempting to have her position made permanent, Plaintiff sought an accommodation that would contravene the needs of the interventional cardiology office and diminish the responsibilities of the targeted position.  "While it is true that the ADA may require an employer to restructure a particular job by altering or eliminating some of its marginal functions, employers are not required to transform the position into another one by eliminating functions that are essential to the nature of the job as it exists." *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1260 (11th Cir. 2001).  As such, Plaintiff's requested accommodation was unreasonable.

Plaintiff asserts that Defendants failed to accommodate her in the following ways: "(1) not allowing her to stay in the interventional cardio position by accepting her offer to take a cut in pay and not making the position permanent; (2) not allowing the Plaintiff to transfer to another available position or creating one for her prior to terminating her; (3) not allowing the Plaintiff to take FMLA; (4) by forcing Plaintiff to take retirement disability; (5) not finding Plaintiff a job when there are over 2,000 nurses positions at UAB; (6) not affording the Plaintiff an interview on all positions which she has in writing applied for; (7) not advising the Plaintiff of the

---

[7] Deposition of Susan Conrad:

> Q: [D]uring that conversation with Dr. Bourge, what did he tell you, if anything, with regard to the position become permanent?

> A: He told me that we—that the position needed to remain a nurse practitioner, because the interventional service need that kind of support as far as the care that was need for the patients in the service—in Interventional Cardiology . . . So he felt like the patients needed to have an advanced practice nurse to be able to help with that role.  So he and I both agreed we needed to leave the position as a nurse practitioner position.

Doc. #58, Ex. B, Conrad Dep. at 43-44.

reason(s) why she was not given an interview for the positions which she has applied; (8) not advising the Plaintiff of who was chosen for the positions for which she has applied; and (9) not allowing Plaintiff to work using a service dog." (Doc. # 62 at 21-22).

As discussed above, Plaintiff has the burden to identify an accommodation *and* establish that the accommodation is a reasonable one. *See Willis v. Conopco, Inc.*, 108 F.3d 282, 283 (11th Cir. 1997). "[A]n employer is not required to accommodate an employee in any manner in which that employee desires." *Terrell v. USAir*, 132 F.3d 621, 626 (11th Cir. 1998) (quotations omitted). The employee "does not satisfy her initial burden by simply naming a preferred accommodation" because "she must show that the accommodation is 'reasonable' given her situation." *Id*. The Rehabilitation Act does not oblige employers to employ people who are not capable of performing the duties of the employment to which they aspire or to create alternative employment opportunities for a disabled person. *See Sutton v. Lader*, 185 F.3d 1203, 1211 (11th Cir. 1999). Nor is an employer required to reassign a disabled employee if there is no vacant position, *see Lucas*, 257 F.3d at 1256-57, or to reallocate job duties to change the essential functions of a job, *see Earl v. Mervyns, Inc*., 207 F.3d 1361, 1367 (11th Cir. 2000). Moreover, it is well-established that an employer is under no obligation to create a new position for an employee. *See Terrell*, 132 F.3d at 626; *Dickerson v. Sec'y, Dep't of Veterans Affairs Agency*, 489 Fed. Appx. 358, 361 (11th Cir. 2012).

Plaintiff's accommodation claim asserting that she was not allowed to stay in the temporary interventional cardio position is a non-starter. Defendant simply was not required to change a temporary position to a permanent one nor was it obliged to create a position in order to accommodate Plaintiff. As to Plaintiff's claim that she should have been allowed to transfer to another available position that Defendant was obliged to create for her, again, that argument

20

misses the mark.  Defendant was under no obligation to create a position for her and, even more importantly, she has wholly failed to identify an available position for which she was qualified to perform the essential functions.  Allowing Plaintiff to take FMLA would not have been a reasonable accommodation because it in no way would have enabled her to perform the essential functions of a position and she was not entitled to SMLS leave when she was no longer employed.  Defendant did not force Plaintiff to take retirement disability—her temporary job came to an end.  Plaintiff argues that Defendant did "not find[] [her] a job," but it is emphatically Plaintiff's duty to identify an *available, existing* position the essential functions of which she was able to perform.  She has wholly failed to do so.  Nor was Plaintiff entitled to an interview for positions for which she did not meet the qualifications.[8]  Finally, until her temporary position ended, Plaintiff was able to use a service dog, when an appropriate dog was available.  And even in the interim, when no appropriate dog was available, Plaintiff was able to use a walker.  As soon as another service dog was available, she was once again accommodated by allowing her to use that more appropriate dog.

The record shows that, contrary to Plaintiff's arguments, Defendants actually accommodated her medical condition.  She has not pointed to a single reasonable accommodation she was denied.  On the other hand, the accommodations identified by Plaintiff were not reasonable.  Plaintiff has wholly failed to meet her burden on summary judgment.  *See Willis*, 108 F.3d at 283.

---

[8] Plaintiff's applications for other jobs at UAB also did not amount to reasonable requests for accommodation.  For example, in December 2009, Plaintiff applied for a position in UAB's Patient Flow Center. (Doc. #58, Ex. A-3 at 2).  Plaintiff did not meet the requirements for the position, which required a bachelor's degree—something Plaintiff did not have at the time. *Id*.  Accordingly, the request was not reasonable, as it would have required Defendant to significantly alter the nature of the position. *Lucas*, 257 F.3d at 1260.  Likewise, Plaintiff's other job applications--that is, her March 2010 application for a Patient Services Coordinator position or her numerous post-termination applications (Doc. #58, Ex. A-3 at 3, 42)--were not reasonable requests for accommodation. Plaintiff has provided no authority for the proposition that the duty to accommodate remains after her employment had already ended for non-discriminatory reasons.

That is, she has not established a *prima facie* case of failure to accommodate under the Rehabilitation Act, and Defendant Board of Trustees is entitled summary judgment on such claim.

### 3.      Plaintiff's Retaliation Claim

In support of her retaliation claim under the Rehabilitation Act, Plaintiff's second Amended Complaint asserts that (a) her assignment in the interventional cardiology office was terminated, and (b) she was not hired into any other position at UAB (adverse employment actions), because she requested reasonable accommodations (protected activity).[9]   In other words, her claim for retaliation encompasses numerous instances of retaliation, occurring both *before* and *after* her termination from UAB on March 26, 2010.

However, in opposition to Defendant's Motion for Summary Judgment, Plaintiff makes no argument in support of her retaliation claims.  (*See, generally,* Doc. # 62).  Thus, she has abandoned these claims.  *See, e.g., Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1322 (11th Cir. 2001) (finding claim abandoned when argument not presented in initial response to motion for summary judgment); *Bute v. Schuller Int'l, Inc.*, 998 F.Supp. 1473, 1477 (N.D. Ga. 1998) (finding unaddressed claim abandoned).  But even if these claims had not been abandoned, Defendant is entitled to summary judgment for the following reasons.

The court begins its analysis of Plaintiff's ADA retaliation claim by noting that the portion of Plaintiff's retaliation claim that addresses instances of retaliation occurring *before* she filed her EEOC charge of discrimination on May 26, 2010 is barred on the basis of Plaintiff's failure to exhaust her administrative remedies.

---

[9] Doc. #18 at 49 ("Plaintiff was denied full benefits and rights under the Rehabilitation Act, in that she was retaliated against based on her exercise of rights to request reasonable accommodations to which she was entitled under the Rehabilitation Act, to include that her employment was wrongfully terminated.").

A plaintiff suing under the ADA must exhaust her administrative remedies prior to filing suit in federal court by filing a charge of discrimination with the EEOC and receiving the statutory notice from the EEOC. *See* 42 U.S.C. § 12117 (making the procedures and remedies applicable to Title VII plaintiffs applicable to ADA plaintiffs suing in the employment context). The scope of a judicial complaint is limited to the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination. *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 466 (5th Cir. 1970)[10]; *see also Gregory v. Ga. Dep't of Human Res.*, 355 F.3d 1277, 1280 (11th Cir. 2004) ("[A] plaintiff's judicial complaint is limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination.").

When a retaliation claim is based on a retaliatory action taken against the employee *after* the initial EEOC charge is filed, the Eleventh Circuit has concluded that the retaliation claim necessarily grows out of a properly filed employment discrimination charge, and it is not necessary for a plaintiff to file a second charge specifically alleging retaliation. *See, e.g., Baker v. Buckeye Cellulose Corp.*, 856 F.2d 167, 169 (11th Cir. 1988). This precedent is applicable to that portion of Plaintiff's retaliation claim that addresses instances of retaliation occurring after she filed her EEOC charge (*i.e.*, Defendant's failure to hire Plaintiff into any of the various jobs that she applied for after her termination from UAB). (Doc. #58, Ex. A-3 at 42). If, however, the alleged retaliatory actions occur *before* the initial EEOC charge is filed (in this case, Defendant's failure to make Plaintiff's position in interventional cardiology permanent and denial of the two

---

[10] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit Court of Appeals adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

23

applications that Plaintiff submitted for jobs at UAB prior to the filing of her EEOC charge),[11] a plaintiff must exhaust her administrative remedies as to that claim by including factual information in the charge that discloses the factual basis for the retaliation claim. *See, e.g., Thomas v. Miami Dade Public Health Trust*, 369 F. App'x 19, 22 (11th Cir. 2010) (noting that any "acts of retaliation that occurred prior to the date of the EEOC charge that were not included in the charge were not exhausted and could not be considered by the district court."), *reh'g en banc denied*, 402 Fed. Appx. 513 (2010). Because the facts supporting part of Plaintiff's retaliation claim occurred prior to the filing of her EEOC charge, that portion of her claim is also subject to exhaustion requirements. *Houston v. Army Fleet Services, L.L.C.*, 509 F.Supp.2d 1033, 1043 (M.D. Ala. 2007).

Here, Plaintiff not only failed to check the retaliation box contained in the charge, but also failed to raise any factual allegation of retaliation in the body of her EEOC charge. The court is aware that some of the incidents on which she bases her retaliation claim are included in her charge. However, Plaintiff's charge related to those incidents only asserted discriminatory conduct and the EEOC charge contains no mention that Plaintiff's claims are being asserted under a retaliation theory. Therefore, the applicable portion of Plaintiff's retaliation claim is barred for failure to exhaust administrative remedies. *See Thomas*, 369 F. App'x at 22; *Houston*, 509 F.Supp.2d at 1043.

In any event, Plaintiff's entire retaliation claim--not just the portion barred as a result of Plaintiff's failure to exhaust her administrative remedies--fails when evaluated under the *McConnell-Douglas* framework. Plaintiff bears the initial burden of establishing a *prima facie* case of retaliation, which requires a showing that: (1) she engaged in statutorily protected

---

[11] Plaintiff applied for two positions prior to her discharge from UAB: an R.N. position in the Patient Flow Center and a Patient Services Coordinator position. *See, e.g.*, Doc. #58, Ex. A-3 at 1-3.

expression; (2) she suffered an adverse employment action; and (3) there was some causal connection between the two events. *Holifield v. Reno*, 115 F.3d 1555, 1556 (11th Cir. 1997).

### 1.        Pre-Termination Retaliation

As to the portion of her claim that addresses instances of retaliation that occurred prior to her departure from UAB, Plaintiff has carried her initial burden of establishing a *prima facie* case.  Indeed, there seems to be little doubt that Plaintiff consistently requested accommodations throughout her tenure in the interventional cardiology office (*i.e.*, engaged in protected activity) and that she was subjected to numerous adverse employment actions by decision makers who were aware of her protected conduct.  And because of the close temporal proximity between her protected activity and Defendant's adverse employment actions, Plaintiff is able to demonstrate a causal connection, at least for *prima facie* purposes. *See Farley v. Nationwide Mutual Insurance Company*, 197 F.3d 1322, 1337 (11th Cir. 1999) ("[A] plaintiff satisfies this element if he provides sufficient evidence that the decision-maker became aware of the protected conduct, and that there was close temporal proximity between this awareness and the adverse employment action.").

However, for the reasons already discussed, this part of Plaintiff's retaliation claim does not survive Rule 56 scrutiny, as she is unable to sufficiently rebut Defendant's articulated explanations for the adverse employment decisions. *See supra* pp. 16-17.  Indeed, Plaintiff presents no evidence to suggest that Defendant's proffered reasoning was pretext for discriminatory retaliation, meaning that she has failed to carry her ultimate burden.  As a result, summary judgment is due to be granted against Plaintiff's pre-termination retaliation claim under the Rehabilitation Act.

### 2.      Post-Termination Retaliation

To the extent that Plaintiff's retaliation claim under the Rehabilitation Act seeks to cover alleged instances of retaliation that occurred after her termination, she cannot avoid summary judgment because she has failed to establish a *prima facie* case.  Granted, Plaintiff can demonstrate the first two *prima facie* elements:  (1) she made requests for accommodation (protected activity); and (2) Defendant failed to award her any of the jobs she applied for after being terminated by UAB (adverse employment action).   However, to satisfy the causation element, at a minimum, a plaintiff must provide "sufficient evidence that the decision-maker became aware of the protected conduct, and that there was close temporal proximity between this awareness and the adverse employment action." *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322 (11th Cir. 1999).   Plaintiff cannot establish a causal connection between her protected conduct and the alleged adverse employment actions because, here, they are too temporally attenuated.

Although a plaintiff can establish a causal connection by showing a "close temporal proximity" between the time an employer becomes aware of the protected activity and the time the adverse action occurs, *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007), the proximity must be "very close." *Clark County School District v. Breeden*, 532 U.S. 268, 273 (2001).  For example, a delay of three to four months is too long, as a matter of law, to prove causation. *Thomas*, 506 F.3d at 1364; *see also Maniccia v. Brown*, 171 F.3d 1364, 1370 (11th Cir.1999) (concluding that "[t]he more than 15–month period that elapsed between Appellant's grievance and the alleged adverse employment actions belies her assertion that the former caused the latter").   In this case, more than two years passed between Plaintiff's requests for accommodation--made almost continually up until her termination from UAB in March 2010--and her first post-termination application for employment at UAB in May 2012. (Doc.

#58, Ex. A-3 at 42).  Accordingly, Plaintiff is unable to establish a *prima facie* case on her post-termination retaliation claims as a matter of law, and Defendant is entitled to summary judgment on these claims.

### G.     Plaintiff's Claim Under the Alabama Disability Discrimination Statute Is Due to Be Dismissed Pursuant to 28 U.S.C. § 1367

Finally, Plaintiff asserts a claim under the Alabama Disability Discrimination Statute against Defendants Bourge, Conrad, and Alesia Jones, in their individual capacities (Count XVI). (Doc. #18 at 52-54).  Because the claim presents a novel issue of state law and all of Plaintiff's federal claims are due to be dismissed, the court chooses to exercise its discretion under Section 1367, dismissing the claim without prejudice.

"In any civil action of which the district courts have original jurisdiction, [they also] have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a).  A court entertaining a suit under the ADA (original jurisdiction) may also hear claims under a state disability discrimination statute (supplemental jurisdiction) if the federal and state claims arise from the same case or controversy.  Having said that, "[t]he district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . (1) the claim raises a novel or complex issue of State law, [or] . . . (3) the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c).

Section 1367(c)(1) reflects the notion that "[s]tate courts, not federal courts, should be the final arbiters of state law." *Baggett v. First Nat'l Bank of Gainesville*, 117 F.3d 1342, 1353 (11th Cir. 1997).  Nowhere is that maxim more relevant than in a case such as this, where a federal court is asked to entertain a purported state law claim that has yet to be recognized by a court of

that respective state.  Specifically, Plaintiff attempts herein to bring a claim under Section 21-7-8

of the Alabama Code, which states:

> It is the policy of this state that the blind, the visually handicapped and the
> otherwise physically disabled shall be employed in the state service, the service of
> the political subdivisions of the state, in the public schools and in all other
> employment supported in whole or in part by public funds . . .

Alabama Code § 21-7-8.  No Alabama court appears to have definitively recognized that Section

21-7-8 creates a private right of action. *See Mobile Fire Fighters Association v. Personnel Board

of Mobile County*, 720 So. 2d 932 (Ala.Civ.App. 1998) ("No reported decision to date discussing

§ 21-7-8 has expressly addressed the existence of a private right of action for damages against a

political subdivision of this state arising from a failure to employ and otherwise qualified person

because of a physical handicap."); *see also Ethridge v. State of Alabama*, 847 F. Supp. 903

(M.D. Ala. 1993) ("Whether § 21-7-8 creates a private right of action appears to be an open

question, and the language of the statute and dearth of case law provide this case with little

guidance.").  As such, Plaintiff's claim raises a novel issue of state law, one that would be most

properly resolved by an Alabama court after the claim's dismissal from this court.

The factor delineated in Section 1367(c)(3)—dismissal of all claims over which the court

has original jurisdiction—also weighs strongly in favor of dismissal in the present case.  As

described above, all of the federal claims advanced by Plaintiff are due to be dismissed.

Accordingly, the court takes heed of the Eleventh Circuit's admonition that "if the federal claims

are dismissed prior to trial, *Gibbs* strongly encourages or even requires dismissal of state

claims." *Mergens v. Dreyfoos*, 166 F.3d 1114, 1119 (11th Cir. 1999) (citations omitted).

"When a court decides not to exercise supplemental jurisdiction under § 1367(c)(3)

because only state claims remain, the proper action is a dismissal without prejudice so that the

complaining party may pursue the claim in state court." *Ingram v. School Board of Miami-Dade*

*County*, 167 Fed.Appx. 107, 109 (11th Cir. 2006) (citing *Crosby v. Paulk*, 187 F.3d 1339, 1352 (11th Cir. 1999)).   As such, the court concludes that Plaintiff's state law claim is due to be dismissed without prejudice pursuant to Section 1367(c).

**V.      Conclusion**

For the reasons stated above, Defendants' Motion for Summary Judgment (Doc. #56) is due to be granted.   A separate order consistent with this memorandum opinion will be entered.

**DONE** and **ORDERED** this August 8, 2014.

R. DAVID PROCTOR
UNITED STATES DISTRICT JUDGE